139 F.3d 247
 329 U.S.App.D.C. 210
 In re Minister PAPANDREOU et al., Petitioners,
Rosemarie Marra and Marrecon Enterprises, S.A., Respondents,
United States of America, Amicus Curiae supporting Petitioner.
 No. 97-7191.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 22, 1998.
Decided April 10, 1998.
 
 [329 U.S.App.D.C. 212] Appeal from the United States District Court for the District of Columbia (No. 96cv01535).
 Richard L. Brusca argued the cause for petitioners. With him on the briefs were Katharine S. Sexton and Rachel Mariner, Washington, DC.
 Mark H. Alcott, New York City, argued the cause and filed the brief for respondents.
 John S. Koppel, Attorney, U.S. Department of Justice, argued the cause for amicus curiae the United States. With him on the briefs were Frank W. Hunger, Assistant Attorney General, Mary Lou Leary, Acting U.S. Attorney at the time the brief was filed, Stephen W. Preston, Deputy Assistant Attorney General, U.S. Department of Justice, Michael Jay Singer, Attorney, and Linda Jacobson, Assistant Legal Adviser for Diplomatic Law and Litigation, U.S. Department of State, Washington, DC.
 Before: WILLIAMS, HENDERSON and GARLAND, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 Concurring opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 The petitioners seeking mandamus in this court, Greek Minister of Tourism Vaso Papandreou and other Greek governmental entities, are defendants in an action in district court (the "Greek Government Defendants"). The plaintiffs in that action, respondents here, are Rosemarie Marra and Marrecon Enterprises, a Liberian corporation of which Marra is president and sole shareholder. Marrecon holds a nine per cent interest in a consortium that paid $44 million for a license to operate a casino in Athens. About a year after issuing the license, the Greek government revoked it and offered to refund the $44 million. In the underlying action plaintiffs seek damages for a breach of contract and an unlawful confiscation of property. The Greek Government Defendants have sought dismissal on several grounds, among them standing defects, the act of state doctrine, lack of personal jurisdiction, the doctrine of forum non conveniens, and the jurisdictional bar of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611.
 
 
 2
 Plaintiffs in the district court sought discovery aimed at evaluation of the FSIA defense, including depositions of Minister Papandreou and Minister of the Economy Gianos Papantoniou, which they say are designed to dig up information on the scope and nature of the defendants' solicitation of U.S. investment in the casino. The district court authorized the depositions, and the Greek Government Defendants now petition for a writ of mandamus [329 U.S.App.D.C. 213] to vacate that discovery order. Finding that the district court failed to consider less intrusive means of obtaining the information the respondents seek, we issue the writ.
 
 
 3
 * * *
 
 
 4
 Mandamus is a "drastic" remedy, "to be invoked only in extraordinary situations." Kerr v. U.S. Dist. Court, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976). One reason for this parsimony is obvious: petitions for mandamus are close substitutes for appeals. Lax rules on mandamus would undercut the general rule that courts of appeals have jurisdiction only over "final decisions of the district courts," 28 U.S.C. § 1291, and would lead to piecemeal appellate litigation. Of course, even under § 1291 a final judgment in the conventional sense of the term is not always necessary; under Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949), a "collateral order" will do. But again, undue expansion of mandamus jurisdiction would circumvent the bounds of the collateral order doctrine, whether the doctrine is viewed as creating an exception to the requirement of finality or as constituting a special form of finality. See generally In re Sandahl, 980 F.2d 1118, 1119-21 (7th Cir.1992) (comparing collateral order review and mandamus in context of order disqualifying lawyer).
 
 
 5
 Though similar, the Cohen and mandamus criteria differ slightly. Mandamus is said to issue only upon a showing that the petitioner's right is "clear and indisputable," Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289, 108 S.Ct. 1133, 1143, 99 L.Ed.2d 296 (1988), and that "no other adequate means to attain the relief" exist, Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 35, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980). Cohen requires that the challenged order "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978). The two clearly have one element in common: mandamus's "no other adequate means" requirement tracks Cohen's bar on issues effectively reviewable on ordinary appeal. But mandamus does not share Cohen's requirement that the issue be separable from the merits (though this seems likely to overlap with inadequacy of ordinary appellate review); instead, mandamus demands an indisputable right--"clear abuse of discretion or 'usurpation of judicial power.' " Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953) (quoting De Beers Consolidated Mines v. United States, 325 U.S. 212, 217, 65 S.Ct. 1130, 1133, 89 L.Ed. 1566 (1945)). "[O]ur cases have answered the question as to the availability of mandamus in situations such as this with the refrain: 'What never? Well, hardly ever!' " Allied Chemical, 449 U.S. at 36, 101 S.Ct. at 190 (emphasis in original). This Pinafore test is an exacting one, but as the following discussion shows, we think that petitioners meet it.
 
 
 6
 * * *
 
 
 7
 We first consider the availability of other means of relief. The ordinary way for a party to obtain quick appellate review of a discovery order is simply to disobey it. If held in contempt, a litigant then has a final order from which he may appeal, asserting any legal flaws in the underlying discovery order. See, e.g., Church of Scientology of California v. United States, 506 U.S. 9, 18 n. 11, 113 S.Ct. 447, 452 n. 11, 121 L.Ed.2d 313 (1992) (citing United States v. Ryan, 402 U.S. 530, 532, 91 S.Ct. 1580, 1581-82, 29 L.Ed.2d 85 (1971)).
 
 
 8
 Mandamus has been recognized as an appropriate shortcut when holding a litigant in contempt would be problematic. In United States v. Nixon, 418 U.S. 683, 691-92, 94 S.Ct. 3090, 3099-100, 41 L.Ed.2d 1039 (1974), the Court found a problem, in full measure, for discovery against the President; it would be "unseemly" to require him to put himself in the position of disobeying a court order, would create an occasion for an inter-branch confrontation, and would even raise a further question of whether the President could be cited for contempt at all. Id. Some circuits have extended the idea, and have been ready to grant mandamus to vacate orders compelling [329 U.S.App.D.C. 214] the testimony of a broad range of executive officials unless the proponent of the order could show extraordinary circumstances. See, e.g., In re FDIC, 58 F.3d 1055, 1060 (5th Cir.1995) (members of the FDIC's Board of Directors); In re United States, 985 F.2d 510, 512 (11th Cir.1993) (Commissioner of the FDA). We, however, have indicated a great reluctance to do so. Given the unique status of the President, see Franklin v. Massachusetts, 505 U.S. 788, 800-01, 112 S.Ct. 2767, 2775-76, 120 L.Ed.2d 636 (1992),[1] we have found that to stretch the doctrine beyond him would raise severe line-drawing problems. Dealing with the FDA Commissioner, we declined relief where he failed to offer any principled line that would have placed him above the 350 other appointees at Executive Level IV of the executive establishment. in rE kessler, 100 F.3d 1015, 1017-18 (D.C.cir.1997). we leave for another day whether Nixon's inter-branch comity considerations could justify use of mandamus to review orders to depose domestic cabinet ministers, because, as we shall see, the deposition of Greek cabinet ministers raises distinctive issues.
 
 
 9
 Another type of recognized problem sometimes justifying mandamus has been a claim of privilege. See, e.g., Rhone-Poulenc Rorer, Inc. v. Home Indem. Co., 32 F.3d 851, 861 (3d Cir.1994). Disclosure followed by appeal after final judgment is obviously not adequate in such cases--the cat is out of the bag. The harder question is whether litigants asserting claims of privilege may not be forced to disobey and risk contempt--a question little addressed in the cases. Decisions demanding more than a lack of effective reviewability at the end of the main case have commonly asked whether the petition raises important issues. See, e.g., In re Long Island Lighting Co., 129 F.3d 268, 270 (2d Cir.1997); Barclaysamerican Corp. v. Kane, 746 F.2d 653, 655 (10th Cir.1984).
 
 
 10
 Again we need not take a position on the issue, because petitioners' immunity claim has special characteristics beyond those of ordinary privilege. The typical discovery privilege protects only against disclosure; where a litigant refuses to obey a discovery order, appeals a contempt order, and wins, the privilege survives unscathed. For an immunity, this is not good enough. "[S]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 443 (D.C.Cir.1990) (internal quotation omitted). The infliction of those burdens may compromise it just as clearly as would an ultimate determination of liability. For that reason a trial court's denial of an immunity defense entitles the defendant to an immediate appeal under Cohen. See, e.g., Midland Asphalt Corp. v. United States, 489 U.S. 794, 800-01, 109 S.Ct. 1494, 1499, 103 L.Ed.2d 879 (1989) ("[D]eprivation of the right not to be tried satisfies the ... requirement of being 'effectively unreviewable on appeal from a final judgment' "). The scope of jurisdictional discovery under FSIA poses the same issue, writ slightly smaller. Here too, we think, immediate review is appropriate.
 
 
 11
 Respondents' suggestion that the Ministers should be forced to take the contempt route betrays a misunderstanding of immunity or diplomacy or both. They urge that this case is like Kessler, where we refused to allow the FDA Commissioner to take an immediate appeal from a district court's order authorizing his deposition. But Kessler did not claim immunity from suit, and he was not the representative of a foreign government. A contempt order offends diplomatic niceties even if it is ultimately set aside on appeal.
 
 
 12
 Here the intervention of the Department of State reinforces our own sense of the demands of international comity. In an amicus [329 U.S.App.D.C. 215] brief listing the Department's Assistant Legal Advisor for Diplomatic Law and Litigation as "of counsel," the United States asserts an interest in "the sensitive diplomatic considerations involved," and supports petitioners' claim. To the extent that the United States offers us legal conclusions, they are of course no more authoritative than those of private litigants.[2] But we grant substantial weight to the Department of State's factual estimation of the exigencies of protocol. See, e.g., Kaczmarczyk v. INS, 933 F.2d 588, 594 (7th Cir.1991); Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1062 (3d Cir.1988). Because petitioners are representatives of a foreign sovereign resisting a discovery order on grounds of sovereign immunity, they satisfy mandamus's requirement that no other adequate means of relief be available.
 
 
 13
 * * *
 
 
 14
 The next issue is whether the district court's deposition order constituted a "clear abuse of discretion." The Foreign Sovereign Immunities Act provides generally that foreign states "shall be immune from the jurisdiction of the courts of the United States...." 28 U.S.C. § 1604. Section 1605 carves out exceptions to the rule. Relevant here are its provisions for district court jurisdiction over civil actions against foreign states in cases
 
 
 15
 in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....
 
 
 16
 28 U.S.C. § 1605(a)(2). The first of these exceptions is the one principally relied on by plaintiffs in the underlying suit, and it is seemingly broadened by another provision, 28 U.S.C. § 1603(e), which defines "commercial activity carried on in the United States" for these purposes as commercial activity "having substantial contact with the United States." In effect, then, the first exception under § 1605(a)(2) is for an action "based upon a commercial activity carried on ... by the foreign state [and having substantial contact with the United States]."
 
 
 17
 Determining whether a suit falls under one of the exceptions of § 1605 often requires a court to look beyond the pleadings. See Foremost-McKesson, 905 F.2d at 449. Consequently, narrowly focused discovery may be permitted to allow plaintiffs to develop the facts necessary to support jurisdiction. See id.; see generally Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 & n. 13, 98 S.Ct. 2380, 2389 & n. 13, 57 L.Ed.2d 253 (1978) (discussing jurisdictional discovery). The district court authorized the depositions challenged here precisely for the purpose of ruling on the FSIA immunity claim.
 
 
 18
 Petitioners argue that the facts respondents seek--details of the alleged solicitation of U.S. investors--are irrelevant to the FSIA inquiry. Their suggestion has surface plausibility, but turns out to be false. Respondents sue (in part) in contract; the necessary elements of that claim are formation of the contract and its breach. The existence of the breach, of course, is disputed, but both sides agree that the award and later revocation of the license took place in Greece. As we have said, the first exception under § 1605(a)(2), once adjusted for the impact of § 1603(e), allows an action "based upon a commercial activity carried on ... by a foreign state [and having substantial contact with the United States]." A suit is "based" upon "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Saudi Arabia v. Nelson, [329 U.S.App.D.C. 216] 507 U.S. 349, 357, 113 S.Ct. 1471, 1477, 123 L.Ed.2d 47 (1993). Thus, as the suit is "based upon" the commercial activity manifested in the contract, the exception is available to plaintiffs only if that commercial activity, carried on by Greece, had "substantial contact with the United States."
 
 
 19
 We have never decided precisely what "substantial contact" amounts to in the FSIA context, though we have said that it requires more than the minimum contacts sufficient to satisfy due process in establishing personal jurisdiction, and have held that two business meetings conducted in the U.S. are not enough. Maritime Int'l Nominees Establishment v. Guinea, 693 F.2d 1094, 1109 (D.C.Cir.1983). And we have rejected recruitment efforts in the U.S. as a basis for jurisdiction over a contract for employment abroad, pointing out, ominously for plaintiffs, that "[n]othing in the legislative history suggests ... that Congress intended jurisdiction under the first clause to be based upon acts that are not themselves commercial transactions, but that are merely precursors to commercial transactions." Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1513 (D.C.Cir.1988). But our cases do not foreclose the possibility that some degree of solicitation in the U.S. might satisfy the "substantial contact" requirement.[3] Thus the depositions do relate to facts on which a FSIA determination could turn.[4] Cf. Nelson, 507 U.S. at 356, 113 S.Ct. at 1477 (leaving "substantial contact" issue open where plaintiff was recruited in the U.S. and contracted to work abroad, and was there subjected to alleged torts).
 
 
 20
 Relevance, however, is not enough. Because sovereign immunity is an immunity from suit, see Foremost-McKesson, 905 F.2d at 443, a district court authorizing discovery to determine whether immunity bars jurisdiction must proceed with circumspection, lest the evaluation of the immunity itself encroach unduly on the benefits the immunity was to ensure. See, e.g., Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 451 (6th Cir.1988). Here, the district court's procedure fell short in two respects.
 
 
 21
 First, oral deposition of cabinet-level officials is quite unusual. See Simplex Time Recorder Co. v. Secretary of Labor, 766 F.2d 575, 586 (D.C.Cir.1985). In Kessler, though denying the FDA Commissioner's request for mandamus because there was no lack of alternative [329 U.S.App.D.C. 217] adequate avenues for review of the deposition order, we expressed no opinion on the correctness of that order under Simplex. See 100 F.3d at 1018. Here we do express an opinion: the order in this case was erroneous. The Ministers are the equivalent of cabinet-level officials. Principles of comity dictate that we accord the same respect to foreign officials as we do to our own. Thus, absent some showing of need for oral testimony from the Ministers, the district court erred in authorizing their depositions.
 
 
 22
 Respondents' counsel suggested at oral argument that they had established a particular need for the Ministers' depositions, but they provided no record support. Their suggestion that only the Ministers could provide the desired facts about the extent of solicitation in the U.S., and only via deposition, is at best obscure. Alternatives seem ample: depositions of Americans who met with the visiting Greek officials or of Greek employees of the Ministry of Tourism, or even interrogatories addressed to the Ministers (to some of which the defendants have already responded). As plaintiffs' complaint in the original suit says that Minister Papandreou only assumed the office of Minister of Tourism after the license was issued (Complaint, p 21), it is particularly mystifying why it is so urgent to depose her on the issue of pre-license solicitations. With no findings by the district court explaining why depositions of the Ministers are necessary, and lots of indications that they are not, we cannot possibly find--or defer to any district court judgment that finds--exceptional need.
 
 
 23
 Second, the district court failed to explore the ease with which other potentially dispositive jurisdictional defenses could be evaluated. The district court postponed discovery on these issues "in order to preserve the significance and benefit of presumptive immunity given to the defendants under the FSIA." Memorandum Order of September 22, 1997 at 7.
 
 
 24
 We think the primacy accorded to immunity values entirely correct; merely deciding other issues may irreparably impair the benefits of immunity. See, e.g., Phaneuf v. Republic of Indonesia, 106 F.3d 302, 304-05 (9th Cir.1997). But primacy of immunity values need not imply priority of immunity determination. Immunity should reduce the expenses, in time and inconvenience, imposed on foreign sovereigns by litigation in U.S. courts. If one (or more) of the other jurisdictional defenses hold out the promise of being cheaply decisive, and the defendant wants it decided first, it may well be best to grapple with it (or them) first. It would be bizarre if an assertion of immunity worked to increase litigation costs via jurisdictional discovery, to the neglect of swifter routes to dismissal.
 
 
 25
 Thus where a colorable claim of immunity is made, a trial court should--at least if the defendant so argues--normally consider other potentially dispositive jurisdictional defenses before allowing FSIA discovery, with an eye towards minimizing the total costs imposed on the defendant. Precise calculation will generally be impossible, and which defense should be decided first is a question ultimately within the discretion of the district court. A sample decision procedure, which captures the relevant concerns but may overstate their arithmetic tractability, would be to eyeball each jurisdictional defense and, for each, divide the estimated burdens of evaluation by the estimated chance of success, and then evaluate the defenses in increasing order of the corresponding quotient.[5]
 
 
 26
 The Greek Government Defendants have urged the district court to consider alternate grounds for dismissal before evaluating the FSIA claim. They assert four defenses that either are jurisdictional or have jurisdictional overtones: standing, forum non conveniens, personal jurisdiction, and the act of state doctrine. Whether a defense is "jurisdictional" is a question of some difficulty, given the "woolliness of the concept." Cross-Sound Ferry Services v. ICC, 934 F.2d 327, 341 (D.C.Cir.1991) (Thomas, J., concurring). But the question is important, since resolving a merits issue while jurisdiction is [329 U.S.App.D.C. 218] in doubt "carries the courts beyond the bounds of authorized judicial action," Steel Co. v. Citizens for a Better Environment, --- U.S. ----, ----, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998), and violates the principle that "the first and fundamental question is that of jurisdiction." Mansfield, Coldwater & Lake Michigan Railway Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). Thus before leaving this area we should say a word about the classification of these defenses.
 
 
 27
 The imperative to decide jurisdictional questions first stems "from the nature and limits of the judicial power of the United States." Id. "Jurisdiction is power to declare the law," Ex Parte McCardle, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868), and where jurisdiction is lacking, federal courts obviously cannot exercise it to decide the cause of action. See Steel Company, at ---- - ----, 118 S.Ct. at 1013-14; see generally Cross-Sound Ferry, 934 F.2d at 340 (Thomas, J., concurring) ("The truistic constraint on the federal judicial power, then, is this: A federal court may not decide cases when it cannot decide cases, and must determine whether it can, before it may.")
 
 
 28
 What is beyond the power of courts lacking jurisdiction is adjudication on the merits, the act of deciding the case. See, e.g., Steel Company, at ---- - ----, ----, 118 S.Ct. at 1012-13, 1020 (O'Connor, J., concurring); Bors v. Preston, 111 U.S. 252, 255, 4 S.Ct. 407, 408, 28 L.Ed. 419 (1884); Cross-Sound Ferry, 934 F.2d at 340, 346 (Thomas, J., concurring); Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Authority, 917 F.2d 48, 53 (D.C.Cir.1990); Rubins Contractors, Inc. v. Lumbermens Mutual Ins. Co., 821 F.2d 671, 673 (D.C.Cir.1987). Thus, although subject-matter jurisdiction is special for many purposes (e.g., the duty of courts to bring it up on their own), a court that dismisses on other non-merits grounds such as forum non conveniens and personal jurisdiction, before finding subject-matter jurisdiction, makes no assumption of law-declaring power that violates the separation of powers principles underlying Mansfield and Steel Company. Indeed, in Steel Company the Court expressly endorsed a court's exercising its discretion to decline pendent jurisdiction without first determining whether pendent jurisdiction existed to be declined, see --- U.S. at ---- n. 3, 118 S.Ct. at 1015 n. 3 (discussing Moor v. County of Alameda, 411 U.S. 693, 715-16, 93 S.Ct. 1785, 1798-99, 36 L.Ed.2d 596 (1973)), and a court's dismissing on grounds of Younger abstention, which it declared to be jurisdictional, without first deciding whether there was a case or controversy, id. (discussing Ellis v. Dyson, 421 U.S. 426, 436, 95 S.Ct. 1691, 1696-97, 44 L.Ed.2d 274 (1975)). See also Federal Rule of Civil Procedure 41(b) (excluding dismissals for lack of jurisdiction, improper venue, and failure to join a party under Rule 19 from certain dismissals otherwise deemed to be on the merits). With these considerations in mind, we turn to the grounds asserted for dismissal.
 
 
 29
 Standing, of course, is jurisdictional. But we note that the Greek Government Defendants' standing claim is based on the point that plaintiff Marrecon is only a member of the injured joint venture (and plaintiff Marra only the sole shareholder of Marrecon), and that the rights in fact belong to the joint venture. We express no opinion as to whether this defense can properly be classified as standing. The defendants argue that (if correct) the joint-venture point means the court could not redress the wrong, but it is not clear that the way in which this defense negates redressability is distinctively different from the way any good merits defense does.
 
 
 30
 Forum non conveniens does not raise a jurisdictional bar but instead involves a deliberate abstention from the exercise of jurisdiction. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 n. 20, 105 S.Ct. 2174, 2185 n. 20, 85 L.Ed.2d 528 (1985). While such abstention may appear logically to rest on an assumption of jurisdiction, see Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504, 67 S.Ct. 839, 840-41, 91 L.Ed. 1055 (1947), it is as merits-free as a finding of no jurisdiction. By the same principle on which the Court has approved a discretionary declination to exercise a pendent jurisdiction that may not have existed, Moor v. County of [329 U.S.App.D.C. 219] Alameda, 411 U.S. 693, 715-16, 93 S.Ct. 1785, 1798-99, 36 L.Ed.2d 596 (1973), approved inSteel Company, at ---- n. 3, 118 S.Ct. at 1015 n. 3, it would be proper to dismiss on such grounds (if meritorious) without reaching the FSIA issue.[6] Similarly, dismissal for want of personal jurisdiction is independent of the merits and does not require subject-matter jurisdiction.
 
 
 31
 Finally, we note that the Supreme Court has authoritatively classified the act of state doctrine as a substantive rule of law. W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Intern., 493 U.S. 400, 408-10, 110 S.Ct. 701, 706-07, 107 L.Ed.2d 816 (1990). Accordingly, resolution of the case on this ground, before addressing the FSIA jurisdictional issue, would exceed the district court's power. See Steel Company, at ----, 118 S.Ct. at 1012.
 
 
 32
 Of course we express no opinion on the merits of these alternative defenses, nor on whether determining them in advance of FSIA immunity would impose a lesser expected burden on the defendants in this case. Those matters are for the district court to determine in the first instance.
 
 
 33
 Because we find the district court erred in authorizing depositions from the Ministers without a showing of need, and without considering possible alternate non-merits routes to dismissal, we grant the petition for a writ of mandamus and vacate the November 7, 1997 order authorizing the depositions. The stay previously issued by this Court expires with the issuance of the writ.
 
 
 34
 So ordered.
 
 
 35
 KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:
 
 
 36
 I concur in the majority opinion except for its suggestion that discovery could reveal facts entitling the appellants to invoke the first commercial activity exception in 28 U.S.C. s1606(a)(2).
 
 
 37
 In Janini v. Kuwait University, 43 F.3d 1534 (D.C. Cir.1995), we held, construing Saudi Arabia v. Nelson, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), that an action for breach of an employment contract, where the breach was caused by a decree of the Kuwaiti Council of Ministers that automatically terminated all contracts between the government and non-Kuwaiti citizens, was "based upon the termination of the employment contracts and not... upon any pre-employment negotiations or recruitment conducted in this country." 43 F.3d at 1536. I believe Janini compels the conclusion that the breach of contract action here is based upon the casino license revocation (which is not alleged to have occurred anywhere but in Greece--plainly not in the United States) and not on any pre-contractual solicitation in this country. Nor do I believe that the license revocation on which the lawsuit is based can have a 'substantial contact with the United States,' as the majority supposes, based on the pre-contractual solicitation activities, which the majority acknowledges can neither form the basis for the transaction, Maj. Op. at 253 n.4, nor even be characterized as " 'commercial transactions,' " id. at 253 (quoting Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1513 (D.C. Cir.1988)). While it is true that "[w]e have never decided precisely what 'substantial contact' amounts to in the FSIA context," Maj. Op. at 253, I cannot imagine we would ever find it attaches to a contractual breach simply by virtue of pre-contractual solicitation.
 
 
 38
 Although I do not believe the appellants can adduce facts to support the first section 1605(a)(2) commercial activity exception, they may be able to do so for the third exception, which the majority found it unnecessary to consider. See Maj. Op. at 253 n.4. If discovery reveals that the Greek government knew its revocation would cause losses to investors in this country, then the revocation may constitute "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" that "causes a direct effect in the United States," triggering the third exception. See Callejo v. Bancomer, S.A., 764 F.2d 1101, 1112 (5th Cir.1985) (action against Mexican [329 U.S.App.D.C. 220] bank for breach of obligations under certificates of deposit issued to American investors comes within third exception where bank "engaged in a regular course of business conduct" with investors "over a several-year period," having "called them in the United States, mailed the certificates to them there, and remitted payments through an American correspondent bank"); cf. Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (Argentina's rescheduling of payment dates for bonds caused direct effect in United States within third exception where bond payees "had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments").
 
 
 
 [1]
 As so often, Churchill expressed the point most vividly, though of course in a radically different constitutional setting:
 In any sphere of action, there can be no comparison between the positions of number one and number two, three, or four.... The loyalties which centre upon number one are enormous. If he trips he must be sustained. If he makes mistakes they must be covered. If he sleeps he must not be wantonly disturbed. If he is no good he must be pole-axed.
 Winston S. Churchill, Their Finest Hour 15 (1949).
 
 
 [2]
 Deference is owed the opinion of the Department of State on some legal issues--for example, the meaning of treaty provisions it negotiated, see, e.g., Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85, 102 S.Ct. 2374, 2379-80, 72 L.Ed.2d 765 (1982), or, before enactment of FSIA, the sovereign immunity of foreign states. See, e.g., National City Bank of New York v. Republic of China, 348 U.S. 356, 360-61, 75 S.Ct. 423, 426-27, 99 L.Ed. 389 (1955); see generally Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486-88, 103 S.Ct. 1962, 1967-69, 76 L.Ed.2d 81 (1983) (discussing history of sovereign immunity). We deal here not with such an issue but simply with a factual question at the heart of the Department's expertise
 
 
 [3]
 Our opinion in Zedan quoted with respect remarks in the legislative history of the FSIA suggesting that the statute would afford jurisdiction over a case based upon "indebtedness incurred by a foreign state which ... receives financing from a private or public lending institution located in the United States." 849 F.2d at 1513. Accordingly, we cannot share what we understand to be the basis for Judge Henderson's separate opinion, namely the belief that, where an action is based on "commercial activity" in the form of a contract allegedly entered into and breached abroad, solicitation activities in the United States could never supply the "substantial contact" between that commercial activity and the United States that is required by § 1603(e). Certainly we do not suggest that a breach of contract action could be "based upon" the solicitation, or that the U.S. solicitation constituted the commercial activity on which the suit is based
 
 
 [4]
 The district court appears to have found relevance under a different theory, one that we think places too much reliance on Gilson v. Republic of Ireland, 682 F.2d 1022 (D.C.Cir.1982), at the expense of the Supreme Court's later decision in Saudi Arabia v. Nelson, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). In Gilson we found possible jurisdiction under FSIA where the plaintiff entered into a contract (formed in the United States) with an instrumentality of Ireland and was allegedly enticed to travel to Ireland, where various wrongs were committed against him. See id. at 1027. We reasoned that if the plaintiff's story were true, his claim might be based upon an act--the enticement--"performed in the United States in connection with a commercial activity of the foreign state elsewhere" and would thus fall within the second exception of 28 U.S.C. § 1605(a)(2). "Section 1605's 'based upon' standard is satisfied", we said, "if plaintiff can show a direct causal connection between his enticement in the United States and the misappropriations in Ireland giving rise to his claims for an accounting, or if he can show that enticement is an element of the cause of action under whatever law governs his claims." Id. at 1027 n. 22. The district court here appeared to authorize discovery to ascertain the causal connection between the solicitation and the contract. But Nelson rejected Gilson's equation of "based upon" with "causal connection," holding that a suit is based only upon the elements of the cause of action. See 507 U.S. at 357, 113 S.Ct. at 1477-78. Inducement is not an element of any cause of action respondents have brought, so the solicitations at issue are not the basis for any claim within the meaning of § 1605. We do not consider the potential application of the third exception of § 1605
 
 
 [5]
 For example, where defendant raises defense A, with a burden of 10 and a likelihood of success of .5, and defense B, with a burden of 15 and a likelihood of success of .8, the quotients are 10/.5 or 20 for A and 15/.8 or 18.75 for B, and the court would start with B
 
 
 [6]
 Any such forum non conveniens dismissal could not, however, be subject to conditions, e.g., a condition that defendants promise to submit to the jurisdiction of another court, for exaction of such a condition would appear inescapably to constitute an exercise of jurisdiction