PARKRIDGE HOSPITAL, INC.,
Plaintiff-Appellee,

v.

Joseph A. CALIFANO, Secretary of
Health, Education and Welfare,
Defendant-Appellant.

The DIPLOMAT LAKEWOOD, INC.,
dba The Aristocrat Nursing Home
—Lakewood, Plaintiff-Appellee,

v.

BLUE CROSS OF NORTHEAST
OHIO, Defendant,

and

Department of Health, Education and
Welfare, Intervenor-Appellant.

Nos. 77–1576, 78–3171.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 29, 1979.

Decided and Filed April 29, 1980.

John L. Bowers, Jr., U. S. Atty., Chattanooga, Tenn., and Barbara A. Babcock, App. Section—Civil Div. Dept. of Justice, for defendant-appellant in case no. 77–1576.

William D. Beyer, U. S. Atty., and Thomas H. Baughman, Cleveland, Ohio, for defendant-appellant in case no. 78–3171.

Leonard Schaitman and Anthony J. Steinmeyer, Dept. of Justice, Civil Div., Washington, D.C., for defendant-appellant in both cases.

Roger W. Dickson, Stopel, Caldwell & Heggie, Jan T. Hall, Chattanooga, Tenn., for plaintiff-appellee in case no. 77–1576.

Morton B. Icove, Lustig, Icove & Lustig, Cleveland, Ohio, for plaintiff-appellee in case no. 78–3171.

Charles E. Hill, Institute for Public Interest Representation, Georgetown University Law Center, Washington, D.C., for amicus Consumer Federation of America.

Carl Weissburg, Robert A. Klein and David K. Replogle, Los Angeles, Cal., for amicus Federation of Amer. Hospitals.

Before EDWARDS, Chief Judge, and KEITH and KENNEDY, Circuit Judges.

EDWARDS, Chief Judge.

These two appeals raise the same legal issues and were assigned for oral argument at the same time. They deal with somewhat complicated problems concerning HEW Regulation 20 C.F.R. § 422.435 (1979), which allows public disclosure of a financial report, called a Provider Cost Report, which is required to be filed by Medicare providers operating under financial reimbursement through the Federal Medicare Program, 42 U.S.C. § 1395 (1976).

Plaintiffs, Parkridge Hospital (Parkridge) in Chattanooga, Tennessee, and Diplomat Lakewood, Inc., (Diplomat) in Lakewood, Ohio, are, respectively, a hospital and a nursing home which provide health care services to patients for which they receive reimbursement under Medicare. The Medicare statute, 42 U.S.C. (Supp. V) § 1395f(b) (1976), allows payment to providers for such services to qualified patients for the lesser of "the reasonable cost of such services" or "the customary charges with respect to such services."

In order to receive reimbursement under the appropriate formula, providers of care such as Parkridge and Diplomat are required to file annual Provider Cost Reports. See 42 C.F.R. §§ 405.406, 405.435 (1977). These Provider Cost Reports are filed with designated "fiscal intermediaries." In the instance of Parkridge, the fiscal intermediary is defendant Blue Cross and Blue Shield of Tennessee; in the instance of Diplomat, it is defendant Blue Cross of Northeast

Ohio. In each of these cases the Department of Health, Education and Welfare has intervened as a defendant.

The disputed regulation, 20 C.F.R. § 422.435 (1979), allows the Secretary to disclose the Provider Cost Reports when a written request for disclosure is made. Such requests have been filed as to both Parkridge's and Diplomat's Provider Cost Reports and the Secretary has given notice that the disclosure requests will be granted. Both Parkridge and Diplomat in widely separated District Courts filed complaints which have resulted in injunctive relief restraining disclosure. It is from these injunctions that appellant Secretary appeals.

These appeals present the same two controlling legal issues: 1) is a regulation issued by the Secretary of Health, Education and Welfare (20 C.F.R. § 422.435 (1979)) which allows disclosure to the public upon written request of Provider Cost Reports "authorized by law"?; and 2) if so, is the regulation nonetheless invalid as an abuse of the Secretary's discretion?

The arguments of the opposing parties are closely balanced. Appellant Secretary relies upon authorization for the regulation which he claims to find in the Medicare statute, 42 U.S.C. § 1306(a) (1976), in the "housekeeping statute" 5 U.S.C. § 301 (1976), and in the agency's adherence to formal rulemaking (*see* 5 U.S.C. § 553 (1976)) in the adoption of 20 C.F.R. § 422.435 (1979). On the abuse of discretion issue, the Secretary offers the rationale that the regulation is well within his discretion because of the need for public participation in keeping honest the use by providers of nearly seven billion dollars of public funds.

Appellees mount a multifaceted attack upon the regulation claiming that as private entrepreneurs they will be seriously damaged by public disclosure of their Provider Cost Reports. They claim that other nursing homes and hospitals will have access to the Provider Cost Reports and can thereupon make use of their financial data to deduce operating methods and practices which the competitors can then copy. They assert that such disclosure violates exemption clauses of the Freedom of Information Act, 5 U.S.C. § 552(b)(3), (4) (1976),[1] and is prohibited by the Trade Secrets Act, 18 U.S.C. § 1905 (1976).

■ This case would be much more difficult to decide but for the opinion of the Supreme Court in *Chrysler Corporation v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). This opinion, issued after both District Court decisions which we now review, has dealt extensively and authoritatively with several of the more difficult questions presented to the District Judges below. In the first instance, *Chrysler* establishes that the plaintiffs in this case cannot rely upon the exemption sections of the Freedom of Information Act as providing a cause of action to enjoin the disclosure of exempted information. The Freedom of Information Act, the Court held, "is exclusively a disclosure statute." *Chrysler Corporation v. Brown, supra* at 292, 99 S.Ct. at 1712, 1713.

In *Chrysler*, Mr. Justice Rehnquist said for the Court:

"Chrysler contends that the nine exemptions in general, and Exemption 4 in particular, reflect a sensitivity to the privacy interests of private individuals and nongovernmental entities. That contention may be conceded without inexorably requiring the conclusion that the exemptions impose affirmative duties on an agency to withhold information sought. In fact, that conclusion is not supported

---

1. In the instant case, plaintiffs principally rely on Exemptions 3 and 4, which read as follows:
   "(b) [FOIA] does not apply to matters that are—
     *   *   *   *   *   *
   (3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;
   (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
   5 U.S.C. § 522(b)(3), (4) (1970).

by the language, logic, or history of the Act.

\*     \*     \*     \*     \*     \*

"The Act is an attempt to meet the demand for open government while preserving workable confidentiality in governmental decision-making. Congress appreciated that, with the expanding sphere of governmental regulation and enterprise, much of the information within Government files has been submitted by private entities seeking Government contracts or responding to unconditional reporting obligations imposed by law. There was sentiment that Government agencies should have the latitude, in certain circumstances, to afford the confidentiality desired by these submitters. But the congressional concern was with the *agency's* need or preference for confidentiality; *the FOIA by itself protects the submitters' interest in confidentiality only to the· extent that this interest is endorsed by the agency collecting the information.*

Enlarged access to governmental information undoubtedly cuts against the privacy concerns of nongovernmental entities, and as a matter of policy some balancing and accommodation may well be desirable. *We simply hold here that Congress did not design the FOIA exemptions to be mandatory bars to disclosure."* *Id.* at 292–293, 99 S.Ct. at 1712, 1713. (Emphasis added). (Footnotes omitted). The Court concluded:

"Congress did not limit an agency's discretion to disclose information when it enacted the FOIA. It necessarily follows that the Act does not afford Chrysler any right to enjoin agency disclosure."

2. § 1905. **Disclosure of confidential information generally**

Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or re-

*Id.* at 294, 99 S.Ct. at 1714.

■ Secondly, *Chrysler* holds that a criminal statute, 18 U.S.C. § 1905 (1976),[2] relied upon by plaintiffs, which generally forbids the disclosure of governmental information "unless authorized by law" is applicable to cases like our instant case. (*See* discussion in *Chrysler, supra* at 299–301, 99 S.Ct. at 1716–1717.) On this score the Court said:

"§ 1905 does address formal agency action and that the appropriate inquiry is whether OFCCP's regulations provide the 'authoriz[ation] by law' required by the statute." *Id.* at 301, 99 S.Ct. at 1717.

■ Thirdly, the *Chrysler* opinion discusses the standards for determining whether or not a disclosure regulation has been "authorized by law." The regulation must be one which is "substantive" in character. The *Chrysler* opinion defines a substantive regulation as one "affecting individual rights and obligations." *Chrysler, supra* at 302, 99 S.Ct. at 1718. We believe that the facts of this case, as well as the statutory language involved, serve to make clear that 20 C.F.R. § 422.435 (1979) does concern individual rights and obligations and is substantive in character.

■ In order to be "authorized by law" the regulation must also be promulgated in accordance with the formal rulemaking requirements set forth in 5 U.S.C. § 553 (1976). It is clear that 20 C.F.R. § 422.435 (1979) was the product of formal rulemaking. *See* 40 Fed.Reg. 27,648–27,651 (1975).

■ Over and above these requirements, in order for the regulation to have "the

lates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

'force and effect of law,' " it is necessary to establish a "nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Chrysler, supra* at 304, 99 S.Ct. at 1719.

None of these standards had been as specifically delineated by the Supreme Court at the time the District Judges who decided these two cases below were grappling with them. As far as statutory interpretation is concerned, we believe that *Chrysler* has left for this court only the question of whether or not the disclosure regulation adopted by the Secretary was "authorized by law" within the meaning of the language just quoted above. It is to this question that we now turn in search of the meaning of the word "nexus".

The first dictionary definition of the word "nexus" is "connection." Such connection cannot readily be found in the "housekeeping statute" 5 U.S.C. § 301 (1976), relied on in part by the Secretary. We do, however, find specific connection between the disclosure regulation and that portion of 42 U.S.C. § 1306(a) (1976) which reads as follows:

§ 1306. **Disclosure of information in possession of agency**

(a) No disclosure of any return or portion of a return (including information returns and other written statements) filed with the Commissioner of Internal Revenue under title VIII of the Social Security Act or under subchapter E of chapter 1 or subchapter A of chapter 9 of the Internal Revenue Code [of 1939], or under regulations made under authority thereof, which has been transmitted to the Secretary by the Commissioner of Internal Revenue, or of any file, record, report, or other paper, or any information, obtained at any time by the Secretary or by any officer or employee of the Department of Health, Education, and Welfare in the course of discharging the duties of the Secretary under this Act, and no disclosure of any such file, record, report, or other paper, or information, obtained at any time by any person from the Secretary or from any officer or employee of the Department of Health, Education, and Welfare, shall be made *except as the Secretary may by regulations prescribe* and except as provided in part D of title IV of this Act [42 USCS §§ 651–660]. Any person who shall violate any provision of this section shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine not exceeding $1,000, or by imprisonment not exceeding one year, or both.

42 U.S.C. § 1306(a) (1972). (Emphasis added).

The *Chrysler* opinion gives us two definitions which we assume describe the reach of the term "nexus." The first describes chiefly what *is* required:

"The pertinent inquiry is whether under any of the arguable *statutory* grants of authority the OFCCP disclosure regulations relied on by the respondents are reasonably within the contemplation of that grant of authority. We think that it is clear that when it enacted these statutes, Congress was not concerned with public disclosure of trade secrets or confidential business information, and, unless we were to hold that any federal statute that implies some authority to collect information must grant *legislative* authority to disclose that information to the public, it is simply not possible to find in these statutes a delegation of the disclosure authority asserted by the respondents here."

*Chrysler, supra* at 306, 99 S.Ct. at 1720. (Footnote omitted.)

The second describes principally what *is not* required:

"This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to them can be binding on courts in a manner akin to statutes. What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued."

*Chrysler, supra* at 308, 99 S.Ct. at 1721.

We notice first in these sentences that the Secretary in this case, in contrast to the

*Chrysler* facts, was not required to rely for disclosure authority upon a statute which merely provided him authority "to collect information." Section 1306(a), in applicable part, reads, "no disclosure . . . shall be made except as the Secretary may by regulations prescribe." As noted above, we read this language quoted from 42. U.S.C. § 1306 as giving a broad grant of authority to the Secretary specifically to enact regulations providing *for release of information* filed with the agency, at least when such disclosure serves the purposes described in the Medicare statute.

Concerning the purpose of the disputed regulation, the Secretary has said:

"The current decision to make the entire cost report available to the public is due in part to our conviction that the reimbursement of provider costs under Medicare, the amount of which is determined through analysis of cost report data, is a public business and, as such, the records involved in the process of implementing this part of the Medicare program are really public records. Providers participating in the Medicare program received a total of $6,821,463,000 for fiscal year 1973. Since such a considerable amount of public funds is invested in these hospitals the right of the public to assure themselves that these funds are being properly paid would seem evident.

The commitment of the Congress to provide the public with access to information about the quality of health care services rendered by providers in the Medicare program was reflected in section 299D of the 1972 Amendments (P.L. 92–603). That provision required that survey reports be made available so that the public could be aware of the existence or absence of deficiencies. Disclosure of cost report information could also help serve this goal by giving the public knowledge of the financial commitment of providers to certain departments or services, as well as the financial stability of the provider."

Medicare fraud on the part of unscrupulous providers has placed a heavy burden on the federal courts. The responsibility of the Secretary for maintaining the integrity of the agency in making payments of nearly seven billion dollars to thousands of providers scattered throughout the nation for care of literally millions of the most helpless of our citizens is staggering.

■ When an agency of government is directly empowered by Congress to disclose information by regulation and does so in accordance with formal rulemaking with the avowed purpose of promoting honest handling and employment of nearly seven billion dollars allocated by Congress to help the aged, the disabled and the ill, we believe that there is a "nexus" between the statutory authorization and the disclosure regulation. We therefore hold that 20 C.F.R. § 422.435 (1979) is "authorized by law" within the meaning of 18 U.S.C. § 1905 (1976).

In what we have said above, we have considered all of the case law written on this issue since the Supreme Court's *Chrysler* opinion. *Chrysler Corporation v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). While we have recognized that the issue is not beyond argument, we believe that the views of Judge Munson in *St. Joseph's Health Center v. Blue Cross of Central New York*, affirmed by the Second Circuit, 614 F.2d 1290 (2d Cir. 1979), represent a better analysis than does Judge Will's contrary views skillfully expressed in *Hospital Affiliates International, Inc. v. Califano*, No. 77C3088, (N.D.Ill., Sept. 28, 1979) (unpublished).

We also accept the Second Circuit's rationale rejecting the D.C. District Court's opinion in *Washington Hospital Center v. Mutual of Omaha*, No. 78–2485 (D.C.D.C., May 16, 1979 and June 25, 1979) (unpublished). We are in agreement with the Second Circuit's conclusion that Congress' refusal to adopt an amendment in 1972 proposed by Senator Ribicoff which would have *required* disclosure of the Provider Cost Reports does not mean that Congress intended to prohibit disclosure. Like the Second Circuit, "we agree with Judge Munson that the congressional.refusal to compel

disclosure indicates not an intention to prohibit disclosure, but rather an intention to leave that decision to the discretion of HEW. The agency exercised that discretion affirmatively in promulgating its regulation, 20 C.F.R. § 422.435." *Id.* Finally, we note that the Fifth Circuit has indicated general support for the views expressed in this opinion. *St. Mary's Hospital, Inc. v. Harris,* 604 F.2d 407 (5th Cir. 1979).

As to the second stated question concerning whether 20 C.F.R. § 422.435 (1979) is arbitrary and capricious, we believe that most of what has been said so far argues for a negative answer. Whatever the merits of the Secretary's case, however, we do not wish to ignore the importance of appellees' claims of competitive disadvantage resulting to them from the public disclosure through Provider Cost Reports. There are three possible answers, however, to these claims. First, these providers are not required by law to furnish care which is subject to government reimbursement. If they operated on only private funds, their entrepreneurial privacy would remain intact.

Second, if they wish to serve Medicare supported patients, they can offset any competitive disadvantage by seeking disclosure of their competitors' Provider Cost Reports. Third, if there is some residual resulting competitive disadvantage, in this court's view it is enormously outweighed by the public advantage of having such huge amounts of public funds expended under public gaze.

For these reasons we hold that the Secretary's actions in issuing 20 C.F.R. § 422.435 and in releasing appellee nursing home's Provider Cost Reports thereunder are not arbitrary and capricious, or otherwise in violation of law.

The judgments previously entered in these cases in the District Courts concerned are vacated and the cases are remanded for the entry of orders dismissing the complaints.