QWEST COMMUNICATIONS
INTERNATIONAL INC.,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

MCI WorldCom, Inc. and AT&T
Corporation, Intervenors.

No. 99–1531.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 2000.

Decided Oct. 27, 2000.

William R. Richardson, Jr. argued the cause for petitioner. With him on the briefs were William T. Lake, Patrick J. Carome, Julie A. Veach, Dan L. Poole, and Robert B. McKenna.

Lawrence E. Sarjeant, Linda Kent, John Hunter, Julie E. Rones, William F. Maher, Jr., Stephen L. Goodman, and Richard White, Jr. were on the brief for amicus curiae in support of petitioner.

Joel Marcus, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson, and Christopher Sprigman, Attorneys. John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, entered an appearance.

Anthony C. Epstein argued the cause for intervenors WorldCom, Inc. and AT&T Corp. With him on the brief were Thomas F. O'Neil, III, William Single, IV, Mark C. Rosenblum, Peter H. Jacoby, Judy Sello, and David Lawson. James P. Young entered an appearance.

Before: WILLIAMS, SENTELLE, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Qwest Communications International, Inc. ("Qwest") petitions for review of a decision by the Federal Communications Commission ("Commission") to disclose raw audit data to competitors in connection with a notice of inquiry concerning the validity and reasonableness of statistical sampling for equipment not found or not verifiable during a field audit.[1] *See In re Ameritech Corporation Telephone Operating Companies' Continuing Property Records Audit et al., Memorandum Opinion and Order,* 15 F.C.C.R. 1784 (1999) *("Order").* Qwest contends that the *Order* is contrary to § 1905 of the Trade Secrets Act, 18 U.S.C. § 1905 (1994), because nothing in § 220(f) of the Communications Act of 1934, 47 U.S.C. § 220(f) (1994), authorizes the Commission to release otherwise protected information. Qwest further contends that the Commission's *Order* violates its own longstanding policy to provide special protection to audit information. We hold that § 220(f) provides sufficient au-

thorization for disclosure of trade secrets, but that the Commission has failed to explain how its *Order* is consistent with its policy regarding the treatment of confidential information. Accordingly, we remand the case to the Commission for further proceedings.[2]

**I.**

Under Part 32 of the Commission's regulations, the Regional Bell Operating Companies ("RBOCs") are required to maintain detailed accounting records of property used in their local telephone operations, including the property's description, location, and cost. *See* 47 C.F.R. §§ 32.2000(e)-(f). The records, which serve various regulatory functions, including the setting of rates and the assessment of charge allocations, must conform to a uniform accounting system prescribed by the rules and must be sufficiently detailed to allow the property's physical existence to be confirmed during a spot check conducted by the Commission. *See id.*

In 1997, the Commission's Common Carrier Bureau's Accounting Safeguards Division ("Bureau") began an audit of the RBOCs' records for hard-wired central office equipment in order "to determine if their records were being maintained in compliance with the Commission's rules and to verify that property recorded in the accounts represented equipment used and useful for the provision of telecommunications services."[3] During the audit, each piece of equipment was categorized or

---

1. U S West Communications, Inc., which filed the petition for review, is a wholly-owned subsidiary of U S West, Inc. During the pendency of this appeal, U S West, Inc. merged and became Qwest Communications International, Inc. Accordingly, we refer to Qwest as the petitioner.

2. In view of our disposition of the Commission's reliance on § 220(f), we do not address the Commission's reliance on § 154(j), 47 U.S.C. § 154(j) (1994). *See Order,* 15 F.C.C.R. at 1788 ¶ 8 & n. 23.

3. The seven RBOCs were Ameritech, Bell Atlantic, BellSouth, NYNEX, Pacific Bell,

Southwestern Bell, and U S West Telephone Companies. *See Public Notice, The Accounting Safeguards Division Releases Information Concerning Audit Procedures for Considering Requests by the Regional Bell Operating Companies To Reclassify or "Rescore" Field Audit Findings of Their Continuing Property Records,* 14 F.C.C.R. 6243, 6243 (1999). The hard-wired central office equipment constitutes approximately one-fourth of the RBOCs' total capital investment. *See Press Release, FCC Releases Audit Reports on RBOCs' Property Records,* Feb. 25, 1999 *("FCC Press Release").*

"scored" as "(1) found [as described]; (2) found in another location; (3) not found/missing; or (4) unverifiable." The Commission explained that part of the audit included "statistical sampling techniques so that the findings for the sample could be extended as representative of all of the equipment in the category audited, *i.e.*, hard-wired central office equipment." After reviewing the RBOCs' comments on draft reports, the Bureau's final audit reports revealed that the RBOCs may have overstated their book costs by as much as five billion dollars.[4] The RBOCs filed objections, in the words of one Commissioner, "aggressively attack[ing] the audits, the competence of the auditors, and the credibility of the audit design."[5] Qwest challenged the Bureau's final audit report, claiming that it failed to reflect additional data accounting for a majority of items scored as "not found," and reaffirming its conclusion that the audit was fatally flawed for statistical and other reasons.[6] In support of the latter point, Qwest submitted an analysis by Deloitte & Touche's "quantitative techniques expert," who raised doubts about the auditors' sampling methodology and their evaluation techniques.

4. *See FCC Press Release.* The audit indicated "that approximately 11 percent of the [RBOCs'] equipment could not be found, and approximately 14 percent was either unverifiable or found in another location." *Order,* 15 F.C.C.R. at 1786 ¶ 3.

5. *In re U S West Telephone Operating Companies' Continuing Property Records Audit, Order,* 1999 WL 133204 (1999) (Commissioner Tristani, issuing separate statement).

6. Qwest's individualized audit report indicated that of the 1188 hard-wired equipment-item records randomly sampled and "scored" for the audit, 294 (24.7% of the sampled items) "contained substantive deficiencies and did not comply with the Commission's rules." *Id.* at ¶ 3. *See also id.* at ¶ 21. Of the 294 deficient records, 152 (12.79% of the sampled items) described equipment that could not be verified against the record; 123 (10.35% of the sampled items) described equipment that could not be found; and 19 (1.60% of the sampled items) described equipment that could only partially be located. *See id.*

The Commission, in turn, issued a notice of inquiry in April 1999, seeking public comment on ten criticisms relating to the audits. *See In re Ameritech Corporation Telephone Operating Companies' Continuing Property Records Audit et al., Notice of Inquiry,* 14 F.C.C.R. 7019, 7021–22 ¶ 6 (1999) ("*NOI*"). The only issue relevant here is Issue 2: namely, "[t]he validity and reasonableness of the methodology used by the Bureau's auditors in determining whether to rescore or to modify a finding during a field audit that equipment was 'not found.'"[7] Previously, in February 1999, the Commission determined, over the dissent of two Commissioners, that pursuant to the RBOCs' waivers of confidentiality, the release of the audit reports and the RBOCs' responses to them was in the public interest.[8] MCI thereafter filed a Freedom of Information Act request, pursuant to 47 C.F.R. § 0.461, seeking public release of the RBOCs' explanations and supporting documentation regarding their equipment not found, the Bureau's audit workpapers showing the scoring of particular items, and the continuing property records themselves.[9]

7. *NOI,* 14 F.C.C.R. at 7021 ¶ 6. Commissioner Furchtgott–Roth indicated apparent agreement with some of the RBOCs' criticisms of the audit's methodology, process, and overall conclusions. *See In re U S West Telephone Operating Companies' Continuing Property Records Audit, Order,* (Commissioner Furchtgott–Roth, dissenting in part).

8. *See FCC Press Release.*

9. MCI sought the release of three types of information:

> [1] any materials that the RBOCs have submitted to the [Bureau] to explain why hard-wired [central office] equipment items were not found by the auditors or to support claims that items in the audit sample should be "rescored." ... [This includes] narrative explanations and supporting documentation such as invoices, telephone equipment orders, property record input forms, engineering drawings, and photographs[;] [2] any audit workpapers generated by [Bureau] staff during the course of the audits that show or support the item-by-

Qwest opposed the release of the raw audit data on three principal grounds: First, releasing the requested information is barred by § 220(f) of the Communications Act and previous Commission rulings and would be an unjustified departure from the Commission's established practice of not releasing audit-related materials, except in exceptional cases; second, the requested information is confidential commercial information, voluntarily submitted, and thus exempt from release under Exemption 4 of the Freedom of Information Act, 5 U.S.C. § 552(b)(4); and third, the requested information constitutes pre-decisional deliberations and as such, is protected by Exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5), and § 0.457(e) of the Commission's rules, 47 C.F.R. § 0.457(e). Qwest indicated that it was opposing only the request for release of data submitted regarding the "not found" and "unverifiable" audit items, explaining that these items "contain[ed] detailed information including pricing information on specific items used in the provision of telecommunications services. . . ." These items, in Qwest's view, were comprised of "highly sensitive business information which MCI could use to unfairly improve its competitive position" relative to Qwest and other market competitors.

The Bureau ordered release of the requested raw audit data to parties under a protective order. The Bureau relied on §§ 154(j) and 220(f) of the Communications Act as providing the Commission with explicit authorization for the discretionary release of audit materials otherwise protected from release under the Freedom of Information Act and the Trade Secrets Act. Relying also on "the Commission's duty to ensure that parties are given a reasonable opportunity to make informed comment on Issue No. 2," the Bureau viewed "the unique situation" created by the question posed in Issue 2 to require the release of information that is "not routinely made available to the public, even under protective orders." The Bureau concluded that the question regarding the "auditors' rescoring process can only be answered by allowing parties interested in filing comments to review this [raw data] material." The Bureau's protective order limited access to the requested materials to (1) counsel for a party participating in the *NOI* proceeding and (2) technical advisors or other persons authorized by such counsel. In the Bureau's opinion, the protective order "reasonably ameliorated" any potential competitive harm to the RBOCs. All of the RBOCs except Bell Atlantic appealed to the Commission.

The Commission affirmed the Bureau's decision to release the raw audit data subject to a protective order, relying principally on the Commission's explicit authority under § 220(f): "[G]iven the importance of Commission audits to the effective performance of the Commission's statutory responsibilities with respect to carriers, [the Commission] believe[s] the [Communications] Act's statutory scheme fully envisions that, in some cases, disclosures of carrier-supplied audit information might become necessary in the course of carrying out the Commission's enforcement and regulatory policymaking functions."[10] *Order*, 15 F.C.C.R. at 1789 ¶ 8. The Commission also imposed "more stringent" terms for access to audit materials, modifying the protective order (1) to restrict access to the audit materials to "persons without decision making authority or influence regarding competitive issues," (2) to redact "vendor-specific pricing informa-

---

item scoring of the items in the audit sample[;] [and 3] [Continuing Property Records] detail (vintage, description, etc.) for any items scored "partially found," "not found," or "not verifiable" at any time during the audit process.

MCI stated that release of the requested raw data was crucial for responding to the questions asked in the *NOI*, particularly Issue 2.

**10.** In a footnote, the Commission cited § 154(j) as an alternate source of its authority. *See Order*, 15 F.C.C.R. at 1788 n. 23.

tion," and (3) to limit the materials to be released to those relating to Issue 2.[11] *Id.* at 1790–91 ¶¶ 13–14. The Commission also provided that the RBOCs could suggest, for Bureau approval, other redactions to the auditors' workpapers and the RBOCs' comments. Qwest petitioned for review of the *Order*.[12]

## II.

 Qwest contends that the Commission's decision to release protected confidential information violates the Trade Secrets Act because the Commission is not "authorized by law" to disclose otherwise protected information. Section 220(f) of the Communications Act, Qwest maintains, is "a *non*disclosure statute that itself prohibits agency employees from releasing information obtained during audits...." Because § 220(f) is "wholly silent as to the power of the Commission to issue [ ] directions" for release of such material, Qwest continues, the statute's "logic and purposes reflect no [Congressional] intention to authorize the Commission to disclose confidential information based solely on the exercise of its own unbounded 'discretion.' "

The parties agree that the material ordered disclosed by the Commission is covered by the Trade Secrets Act. Hence, the question is whether the Communications Act vests the Commission with authority to disclose information covered by the Trade Secrets Act, or more specifically, whether, for purposes of § 1905 of the

Trade Secrets Act, the Commission was authorized under § 220(f) of the Communications Act to allow Qwest's competitors access to Qwest's raw audit data.

The parties disagree about our standard of review. We agree with the Commission that our principal inquiry of the meaning of § 220(f) follows the familiar two-part test under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984): The court "must give effect to the unambiguously expressed intent of Congress" or in the absence of such intent, consider whether the agency's interpretation is a "permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Necessarily, however, we must first examine what Congress intended by § 1905 of the Trade Secrets Act, and in this regard, as Qwest contends, our review is *de novo*. Hence, we look first to the language of § 1905 and seek guidance from its structure and history. *See Chrysler v. Brown*, 441 U.S. 281, 296, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). We then do much the same in examining § 220(f) of the Communications Act, reaching the Commission's interpretation of its enabling statute only if Congressional intent is unclear.

Section 1905 of the Trade Secrets Act prohibits the unauthorized release of trade secrets and commercial information, unless "authorized by law," subject to punishment by fine and imprisonment and removal from office or employment. *See* 18 U.S.C. § 1905.[13] The history of the Act, which

---

**11.** Noting that MCI had not requested disclosure of materials concerning undetailed investment, the Commission decided not to require access to such information. *See id.* at 1791 ¶ 14.

**12.** The court granted Qwest's motion for a stay pending review.

**13.** Section 1905 provides in relevant part:
Whoever, being an officer or employee of the United States or of any department or agency thereof, ... publishes, divulges, discloses, or makes known in any manner or to any extent not *authorized by law* any information coming to him [or her] in the

course of his [or her] employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department ... , which information concerns or relates to [ ] trade secrets ...; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.
18 U.S.C. § 1905 (emphasis added).

was originally enacted in 1864, traces back to Congressional concern over disclosures of business information by "feckless or corrupt revenue agents." *Chrysler*, 441 U.S. at 296, 99 S.Ct. 1705. When Congress in 1948 consolidated three statutes barring or limiting the release of such information, it sought to address the demands of the new administrative state and thereby broadened the reach of the Trade Secrets Act. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1149 n. 122 (D.C.Cir. 1987). As the court has previously recounted, Congress "recogni[zed] that increased governmental access to financial records and commercial operations of individuals and entities … had to be accompanied by some restraint on the freedom of governmental employees to disseminate such data to third parties." *Id.*

The limits established by the Trade Secrets Act, however, are not inconsistent with authorizations granted to federal agencies to release data when necessary for the carrying out of the agencies' statutory responsibilities. In *National Parks and Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C.Cir.1976), the court noted that the Trade Secrets Act is "merely a general prohibition against unauthorized disclosures of confidential commercial or financial information." *Id.* at 687 n. 50. The court in *CNA*, continuing to explore the nature of the statute, observed that the Trade Secrets Act:

> seems to embody a congressional judgment that private commercial and financial information should not be revealed by agencies that gather it, *absent a conscious choice* in favor of disclosure by someone with power to impart the force of law to that decision. The Act attempts to forestall casual or thoughtless divulgence—disclosure made without first going through a deliberative process—with an opportunity for input from concerned parties.

*CNA*, 830 F.2d at 1141 (emphasis added).

In the leading case on the question of the authorization required by § 1905 for release of trade secrets, the Supreme Court interpreted the phrase "authorized by law" not to have "a special, limited meaning." *Chrysler*, 441 U.S. at 298, 99 S.Ct. 1705. Instead, the Supreme Court instructed that the exercise by an agency of quasi-legislative power "must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes." *Id.* at 302, 99 S.Ct. 1705. More directly, the Court stated that "[w]hat is important" is whether the reviewing court could reasonably conclude that the statutory grant of authority contemplated the regulations providing for release of information. *Id.* at 308, 99 S.Ct. 1705. Thus, in rejecting the contention that an Executive Order directing the Secretary of Labor to adopt regulations as are "necessary and appropriate" meant that all regulations so promulgated have the full "force and effect of law," the Court focused on whether there was a "nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Id.* at 304, 99 S.Ct. 1705. Looking at the statutory sources for the Executive Order,[14] the Court concluded that "it is clear that when it enacted these statutes, Congress was not concerned with public disclosure of trade secrets or confidential business information…." *Id.* at 306, 99 S.Ct. 1705. By way of illustration, the Court contrasted the situation in *NBC v. United States*, 319 U.S. 190, 217, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), where, based on the language and logic of the Communications Act, which vested comprehensive powers in the Commission, the Court upheld Commission regulations that extended beyond technical, engineering requirements. *See Chrysler*, 441 U.S. at 308, 99

---

**14.** Among the possible sources were the Federal Property and Administrative Services Act of 1949, Titles VI and VII of the Civil Rights Act of 1964, and the Equal Employment Opportunity Act of 1972. *See Chrysler*, 441 U.S. at 304–05 & nn. 34–36, 99 S.Ct. 1705.

S.Ct. 1705. A mere housekeeping statute, on the other hand, whose history indicated that it was "simply a grant of authority to the agency to regulate its own affairs," would not suffice to authorize disclosure of confidential business information because it was not intended to provide authority for limiting the scope of the Trade Secrets Act. *Id.* at 309, 99 S.Ct. 1705.

Under § 220(a) of the Communications Act, the Commission is authorized to direct the kind of financial books and records that carriers must maintain so that the Commission can fulfill its mandate of ensuring that carriers' rates and practices are just and reasonable. *See* 47 U.S.C. § 220(a). In establishing a uniform system of accounts, the Commission is charged with "ensur[ing] a proper allocation of all costs to and among telecommunication services, facilities, and products...." *Id.* § 220(a)(2). Under § 220(c), the Commission "shall at all times have access to and the right of inspection and examination of all accounts, records, and memoranda" maintained by the carrier pursuant to § 220. In addition, the Commission may use public accounting services. In this connection, subsection (c) provides an exception to nondisclosure laws as well as a nondisclosure limitation on persons having access to information submitted to the Commission. Subsection (c) provides that "[a]ny provision of law prohibiting the disclosure of the contents of messages or communications shall not be deemed to prohibit the disclosure of any matter in accordance with the provisions of this section." *Id.* § 220(c). The statute further provides that any person conducting a Commission audit shall have the powers of the Commission under subsection (c) and shall be subject to subsection (f) "in the same manner as if that person were an employee of the Commis-

sion." *Id.*[15] Section 220(f), in turn, provides:

> No member, officer, or employee of the Commission shall divulge any fact or information which may come to his [or her] knowledge during the course of examination of books or other accounts, as hereinbefore provided, *except* insofar as he [or she] may be directed by the Commission or by a court.

*Id.* § 220(f) (emphasis added).

Subsection (f), first mentioned in § 220(c) after a sentence that removes any legal obstacles to the disclosure of information submitted to the Commission in accordance with § 220, places nondisclosure burdens on all persons having access to confidential information submitted to the Commission. Thus, its strict limitation on how confidential information is to be handled arises in a context in which the Commission will have access to information that is otherwise protected by law from disclosure. Nevertheless, Congress alluded to the possibility of disclosure by the Commission (and the court). Qwest's contention that § 220(f) is "an integral part of a *non*disclosure statute" is correct so far as it goes. However, viewing § 220(f) as directed to nondisclosure does not mean that its last clause has no role to perform, much less nothing to do with the conditions under which disclosures may occur. Under *Chrysler,* § 1905 is satisfied without a provision of law that expressly refers to trade secrets. *See Chrysler,* 441 U.S. at 308, 99 S.Ct. 1705.

Congressional intent to allow an exception to nondisclosure seems implicit in the statutory scheme. In the Communications Act of 1934, Congress delegated broad authority to the Commission in carrying out its responsibilities for oversight of licensing, rate making, and carrier practices. *See* 47 U.S.C. § 151 *et seq.*; *NBC,* 319 U.S.

---

**15.** The other provisions of § 220 are not directly applicable to this analysis. Section 220(b) concerns depreciation charges, *see* 47 U.S.C. § 220(b), while subsection (d) establishes a penalty against carriers for failure to comply with the record-keeping provisions, *see id.* § 220(d), and subsection (e) establishes a penalty for false entries in, and destruction or alteration of, records by any carrier. *See id.* § 220(e).

at 217–20, 63 S.Ct. 997. Significantly, in § 220, Congress placed in the Commission the responsibility to "ensure a proper allocation of all costs." 47 U.S.C. § 220(a)(2). With the additional provisions authorizing audits, it reasonably follows that Congress contemplated that the Commission would be reviewing the type of data at issue here. Thus, unlike the statutes that were considered by the Supreme Court in *Chrysler,* *see* 441 U.S. at 304–09, 99 S.Ct. 1705, § 220 focuses on the need for the Commission to have access to confidential information regarding licensees and others, and to determine how such information is to be protected when the Commission carries out its responsibilities. The former is addressed in § 220(c), the latter in § 220(f). When Congress consolidated various statutes on trade secrets in 1948, it gave no indication that federal agencies' interpretation of their authority to release confidential data was in error, much less no longer of force and effect.[16] Nothing in *Chrysler* suggests that a comparable situation existed with respect to the statutes considered in that case. *See Chrysler,* 441 U.S. at 308, 99 S.Ct. 1705.

To the extent Qwest contends that § 220(f) is too broad an authorization, in its view leaving the Commission with unfettered discretion, we offer two responses. First, contrary to Qwest's contention, *Chrysler* does not require that the statutory authorization under § 1905 be directed, or limited, to trade secrets.[17] Rather, as the Supreme Court emphasized in *Chrysler,* the important question is whether the reviewing court can reasonably conclude that the grant of authority contemplates the regulations issued. *See Chrysler,* 441 U.S. at 308, 99 S.Ct. 1705. *Chrysler*'s test is, in one sense at least, a nondemanding one with respect to the purpose of the Trade Secrets Act—namely, to ensure that

Congress has authorized release of covered information and that any such release occurs only after deliberation by appropriate officials. *See CNA,* 830 F.2d at 1141–42. Section 220(f) is consistent with the restraint that Congress sought to impose in the Trade Secrets Act because it permits release only on order of the Commission (or the court) where, as the Supreme Court noted, such release would be consistent with the purposes of the Communications Act. *See Chrysler,* 441 U.S. at 307–08, 99 S.Ct. 1705. As we discuss in Part III, the Commission has adopted a *Confidential Information Policy* and regulations for release decisions to be made upon consideration of certain factors by appropriate officials.

Second, other circuits have concluded that, under *Chrysler,* a broadly stated grant of authority to disclose confidential information suffices for purposes of § 1905. Thus, the Fourth Circuit in *Humana of Virginia, Inc. v. Blue Cross,* 622 F.2d 76 (4th Cir.1980), upheld the Secretary of Health, Education, and Welfare's "broad discretion to permit disclosure" where the statute, 42 U.S.C. § 1306(a), provided that "[n]o disclosure ... shall be made *except* as the Secretary ... may by regulations prescribe ...." *Id.* at 78 (emphasis added). Relying on *Chrysler*'s test, that "[t]he grant of authority relied upon by a federal agency in promulgating regulations need not be specific; it is only necessary 'that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued,'" *id.* (quoting *Chrysler,* 441 U.S. at 308, 99 S.Ct. 1705), the court concluded with respect to the disclosure of cost reports, that "absent any action by the Secretary, disclosure would be prohibited. Such material, however, is not exempt

16. See, for example, § 20(7)(f) of the Interstate Commerce Act of 1887, 49 U.S.C. § 20(7)(f) (1976) (current version at 49 U.S.C. §§ 11904, 14908, 16103 (1994 ed. Supp. I 1995)), which is the apparent model for § 220(f).

17. *Bartholdi Cable Co., Inc. v. FCC,* 114 F.3d 274 (D.C.Cir.1997), is not to the contrary, as Qwest suggests. Indeed, in *Bartholdi,* the court did not reach the statutory question that is at issue here. *See id.* at 281–82.

from disclosure for by its very terms the statute contemplates the issuance of regulations by the Secretary permitting such disclosure." *Id.* at 79. In *St. Mary's Hospital, Inc. v. Harris,* 604 F.2d 407 (5th Cir.1979), the Fifth Circuit had reached the same conclusion about a regulation authorizing disclosure of cost reports, stating that "[s]ection 1306 bars the disclosure of Medicare providers' costs reports unless the Secretary in his discretion promulgates a regulation like [the one being challenged] ordering disclosure of these reports.... At the very least § 1306 may reasonably be construed to contemplate the promulgation of [a regulation such as is at issue]." *Id.* at 410. The Sixth Circuit agreed in *Parkridge Hospital, Inc. v. Califano,* 625 F.2d 719 (6th Cir.1980), interpreting the statute to be "a broad grant of authority to the Secretary specifically to enact regulations providing for the release of information filed with the agency, at least when such disclosure serves the purposes described in the statute." *Id.* at 724.

While Qwest would distinguish the statute in *Humana, Parkridge,* and *St. Mary's* as reflecting Congress' clear intent to permit disclosure of trade secrets, the effect of the last clause of § 220(f) of the Communications Act is essentially the same. That is, in both types of statutes Congress has alluded in an "except" clause to the possibility of disclosure of protected information, and in both circumstances assured that the Secretary and the Commission must reach a considered determination

about releasing protected information. The different statutory treatment by Congress can be said to reflect not a difference in congressional intent but the fact that the Secretary is an individual decision-maker, and by requiring the promulgation of regulations, Congress constrained the Secretary's decision-making authority regarding the release of protected information. Comparable constraint inheres in the statutory requirements that the Commission may act only as a deliberative body, when there is a quorum, when parties may be heard, and when its actions are made on the record. *See generally* 47 U.S.C. §§ 154(h), (j).

Accordingly, we hold that the Communications Act, and specifically, § 220(f), does not clearly rule out the Commission's interpretation, which we find reasonable.

### III.

■ The question remains whether the Commission has acted arbitrarily and capriciously in ordering the release of Qwest's raw audit data to some of its competitors.[18] *See Chrysler,* 441 U.S. at 318, 99 S.Ct. 1705; *Bartholdi,* 114 F.3d at 279. Qwest contends that the release order is "flatly inconsistent" with the Commission's prior assurance that raw audit data would be protected. More particularly, Qwest contends that the Commission's *Order* is contrary to its precedents on the treatment of confidential information.[19] Qwest calls attention to the unprecedented

---

**18.** Although Qwest states in its briefs that the "sole" issue on appeal is whether the Communications Act authorizes the Commission to release trade secrets, and arguably the court is entitled to take Qwest at its word, *see* FED. R.APP. P. 28(a)(9); *J.S.G. Boggs v. Rubin,* 161 F.3d 37, 42 (D.C.Cir.1998) (citing *Carducci v. Regan,* 714 F.2d 171 (D.C.Cir.1983)); *Adams v. Hinchman,* 154 F.3d 420, 424 n. 7 (D.C.Cir.1998), the arguments in Qwest's briefs suffice to preserve a second issue for appeal. The Commission has addressed Qwest's contention on the assumption that the court might conclude that the contention was properly preserved, and hence there is no prejudice to the Commission as a result of Qwest's failure to clearly designate in its

briefs its alternative contention. *See* FED. R.APP P. 28(a)(5), (8).

**19.** Before the Commission, Qwest argued that the release decision was not only contrary to statute, but "contrary to the Commission's own precedent regarding treatment of audit information" and would adversely affect both Qwest's competitive position, and the Commission's ability to perform future audits. In addition, Qwest asserted that release breached the understanding and expectation that it had in submitting such information to the Commission—namely, that the information would be kept in confidence.

nature of the release, maintaining that "whatever authority the Commission may have to disclose trade secrets in other kinds of proceedings in order to vindicate rights to public participation, the logic and purposes of the statutory provisions governing confidential agency audits are quite different." The *Order* constitutes, in Qwest's view, a "standardless 'discretionary' exemption from disclosure" justified solely on the Commission's unprecedented step of opening audits to public comment.

The Commission's *Confidential Information Policy* includes three paragraphs regarding audits that are pertinent here. *See In re Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission, Report and Order,* 13 F.C.C.R. 24816, 24847–49 ¶¶ 53–55 (1998), *amended by* 14 F.C.C.R. 20128 (1999) ("*Confidential Information Policy*"). Paragraph 53 provides that only summary audit data will be released, and only under special circumstances. *See id.* at 24847–48 ¶ 53. Those special circumstances arise when: "(i) the summary nature of the data therein is not likely to cause the submitter substantial competitive injury; (ii) the release of the summary data and information is not likely to impair [the Commission's] ability to obtain information in future audits; and (iii) overriding public interest concerns favor release of the report." *Id.*

Paragraph 54 explains the Commission's view of audit reports:

> The Commission has a longstanding policy of treating information obtained from carriers during audits as confidential. . . . Carriers have a legitimate interest in protecting confidential information, and we agree that disclosure could result in competitive injury to those who provide such information to the Commission. This policy is also designed to enhance the efficiency and integrity of our audit process by encouraging carriers to comply in good faith with Commission requests for information. Moreover,

the Commission considers the audit reports to be internal agency documents that, consistent with FOIA Exemption 5, generally should not be disclosed to the extent they present staff findings and recommendations to assist the Commission in pre-decisional deliberations.

*Id.* at 24848 ¶ 54. Paragraph 54 also states that the Commission "will amend Section 0.457 of [its] rules to indicate that information submitted in connection with audits . . . will not routinely be made available for public inspection." *Id.*

In paragraph 55, the Commission identified the standards that it would apply were confidential audit information to be released. Observing that it has "only rarely departed from the general policy of withholding audit information from public disclosure," the Commission advised nonetheless that,

> [p]arties should note, however, that as in the past, we may publicly disclose audit information in *rare cases* where the underlying concerns that normally lead us to withhold audit information from public disclosure are diminished by the minimal risk posed by the release of aggregate data or, where the data is otherwise not highly commercially sensitive and disclosure is justified by significant public interest factors.

*Id.* at 24848–49 ¶ 55 (emphasis added). Thus, § 0.457 of the Commission's regulations provides, in part, that "[t]he records in this section are not routinely available for public inspection," 47 C.F.R. § 0.457, and in subsection (d) that "[t]rade secrets . . . are not routinely available for public inspection. . . . A persuasive showing as to the reasons for inspection will be required in requests for inspection of such materials submitted under § 0.461." *Id.* § 0.457(d).

Numerous cases reflect the Commission's application of Paragraphs 53 and 54 of its *Confidential Information Policy* and

§ 0.457 of its regulations.[20] None Qwest maintains, until now, involved the release, pursuant to Paragraph 55, to a competitor of raw audit data in an audit or audit-related proceeding. In applying its *Confidential Information Policy*, the Commission has heretofore acknowledged a distinction between summary audit data and raw audit data:

> [T]he release of commercial and financial information of only a summary nature does not present the concerns about competitive harm that normally lead us to withhold audit-derived information from public disclosure.... The Summary contains no detailed underlying commercial or financial information submitted by the BOCs; rather it presents a brief analysis of the aggregated underlying data. The summary nature of this information significantly diminishes the likelihood that the BOCs will suffer any competitive harm.

*In re Bell Telephone Operating Companies, Memorandum Opinion and Order,* 10 F.C.C.R. 11541, 11542 ¶ 6 (1995).

Thus, the Commission has explained that it "withholds ... raw financial data obtained from carriers during audits as well as audit workpapers compiled by Commission staff" in accord with its "general policy [ ] to withhold from public disclosure audit reports prepared by Commission staff." *In Re GTE Telephone Operating Companies, Memorandum Opinion and Order,* 9 F.C.C.R. 2588, 2588 ¶ 4 (1994). *See also BellSouth,* 8 F.C.C.R. at 8129 ¶ 8. "[A]udit reports [that] contain substantial raw data and other information provided by various [Local Exchange Carriers] that has not

been summarized, reformatted, or otherwise edited," the Commission has explained, "[are] not routinely available for inspection." *Platt,* 5 F.C.C.R. at 5742 ¶ 6. The Commission's view has been that the release of raw audit data "would likely impair the Commission's ability to obtain necessary information in the future." *Rafferty,* 5 F.C.C.R. at 4138 ¶ 2. Where the Commission has ordered the release of confidential financial information even if there is the possibility of competitive harm as a result, the occasions appear to have been confined to an adjudication, rulemaking, or a rate proceeding in which a party has placed its financial condition at issue.[21]

Qwest and amicus United States Telecom Association point out that audits "are not voluntary, afford no statutory right of public participation, and have historically involved" only the Commission and the entity being audited. Consistent with these concerns, the Commission, has applied its *Confidential Information Policy* strictly, allowing exceptions in audits and related proceedings only for release of summaries of audit data that do not reveal "competitively sensitive materials." *Confidential Information Policy,* 13 F.C.C.R. at 24824 ¶ 9. While the Commission states that its *Order* establishes no "precedent that compromises the integrity of the audit process," *Order,* 15 F.C.C.R. at 1790 ¶ 11, the Commission's rulings, regulations, and *Confidential Information Policy* reflect a different approach. As applied by the Commission, the exceptional circumstances considered in the *Confidential Information Policy* for audits and in Commission

---

20. *See, e.g., In Re BellSouth Corporation Bell-South Telecommunications, Inc., Memorandum Opinion and Order,* 8 F.C.C.R. 8129, 8130 ¶ 7 (1993) ("*BellSouth*"); *In Re Martha H. Platt, Memorandum Opinion and Order,* 5 F.C.C.R. 5742, 5742 ¶ 6 (1990) ("*Platt*"); *In Re Scott J. Rafferty, Memorandum Opinion and Order,* 5 F.C.C.R. 4138, 4138 ¶ 3 (1990) ("*Rafferty*"); *In Re Western Union Telegraph Company, Memorandum Opinion and Order,* 2 F.C.C.R. 4485, 4486 ¶ 10 (1987).

21. *See, e.g., In re Alaskans for Better Media, Memorandum Opinion and Order,* 70 F.C.C.2d 1366 (1979); *In re Classical Radio for Connecticut, Inc. and WTIC–FM Listeners' Guild, Memorandum Opinion and Order,* 69 F.C.C.2d 1517 (1978); *In re NTV Enterprises, Inc., Memorandum Opinion and Order,* 62 F.C.C.2d 722 (1976).

rulings appear to have been confined to release of summary audit data.

Still, the unprecedented nature of the Commission's *Order* does not itself demonstrate arbitrariness. *See Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 204–06 (D.C.Cir.1994). But, in view of the policy by which the Commission has constrained the exercise of its discretion under § 220(f), its decision to release Qwest's raw audit data to its competitors likely would be arbitrary and capricious if the Commission failed to explain how it reached the conclusions that (1) the raw audit data is "otherwise not highly commercially sensitive," and (2) "disclosure is justified by significant public interest factors." *Confidential Information Policy*, 13 F.C.C.R at 24849 ¶ 55. *See also* 47 C.F.R. § 0.457(d).

In addressing Qwest's claims of harm, the Commission determined that its protective order, as amended, would ensure that any competitive harm is minimal. *See Order*, 15 F.C.C.R. at 1790 ¶ 12. This reasoning followed, the Commission concluded, because disclosure was for the limited purpose of responding to Issue 2 as to sampled items not found, unidentified, or found in another location. *See id.* This is not the same as finding that Qwest's raw data is "otherwise not highly commercially sensitive," or a finding that release of the data would not adversely affect Qwest's competitive position. *Confidential Information Policy*, 13 F.C.C.R. at 24849 ¶ 55. Indeed, the Commission appears to acknowledge that the data is commercially sensitive, rationalizing release on the ground that the protective order ensures against competitive harm or ensures that such harm would be minimal.

In concluding that the public interest outweighs any potential competitive harm to the RBOCs, the Commission observed that the RBOCs raised issues that the auditors' rescoring was not done correctly, and that the previously released summaries of the auditors' general procedures were insufficient to elicit useful informa-tion, which the Commission defined in terms of being able to comment on how the auditors' general procedures were actually implemented. *See Order*, 15 F.C.C.R. at 1789 ¶ 9. Observing that it has "rarely, if ever, sought public comment on its auditors' methodology and findings," the Commission stated that it "was sufficiently concerned about the issues surrounding the audits to invite public comment," and that broader comment "will greatly assist" the Commission in resolving the issues. *Id.* at 1790 ¶ 11. Advising on appeal that the focus of Issue 2 involving audit methodology is unprecedented, the Commission repeats that "unusual events call for an atypical response."

Missing from the Commission's decision is a discussion of why such an unprecedented release of confidential audit information is required for purposes of Issue 2. The Commission stated that "useful information about the accuracy and validity of the audits" could not be obtained "unless commenters were allowed to examine how those general procedures were actually implemented when the auditors decided whether rescoring was appropriate." *Id.* at 1789 ¶ 9. But it is unclear why this is so. The Deloitte & Touche analysis submitted by Qwest, for example, appears to suggest that the sampling methodology could be evaluated in theoretical terms as applied to hypothetical situations or to a composite of raw data without identifying an individual RBOC's sensitive commercial information. Other ways of avoiding the release of raw audit data to competitors might be equally effective for the Commission's purposes. Or, at least on the basis of the record, the court cannot tell that other ways would not be equally effective. Before invoking its "rare case" exception to its nondisclosure policy, the Commission must consider plausible alternatives and discount them before resorting to the release of raw audit data. Otherwise, Qwest's claim that the *Order* represents a standardless exemption from the Commission's policy and precedent gains force. A

response that the protective order adequately protects Qwest against competitive injury misses the mark. The Commission must explain why only the release of raw audit data will achieve meaningful public comment. In submitting audit data, Qwest was entitled to rely on the Commission's announced policy and precedent on how it would handle confidential audit information. Qwest is similarly entitled to assurances that the unprecedented disclosures will be consistent with the standards that the Commission has set for itself and that the invocation of the "rare case" exception under Paragraph 55 is warranted. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Accordingly, we deny the petition in part, and we remand the case to the Commission for further consideration.